Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOON KEAI JIMMY SIM, derivatively on behalf of LUNA INNOVATIONS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT A. GRAEFF, EUGENE J. NESTRO, GEORGE GOMEZ-QUINTERO, N. LEIGH ANDERSON, DAVID CHANLEY, PAMELA COE, WARREN B. PHELPS, III, RICHARD W. ROEDEL, GARY SPIEGEL, and MARY BETH VITALE,<br><br>Defendants,<br><br>and<br><br>LUNA INNOVATIONS INCORPORATED,<br><br>Nominal Defendant. | Case No.:<br><br><br>**DEMAND FOR JURY TRIAL**<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

---

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Soon Keai Jimmy Sim ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Luna Innovations Incorporated ("Luna" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Scott A. Graeff ("Graeff"), Eugene J. Nestro ("Nestro"), George Gomez-Quintero ("Gomez-Quintero"), N. Leigh Anderson ("Anderson"), David Chanley ("Chanley"), Pamela Coe ("Coe"), Warren B. Phelps, III ("Phelps"), Richard W. Roedel ("Roedel"), Gary Spiegel ("Spiegel"), and Mary Beth Vitale ("Vitale") (collectively, the "Individual Defendants," and together with Luna, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Luna, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Graeff, Nestro, and Gomez-Quintero for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Luna, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 16, 2022 through April 19, 2024, inclusive (the "Relevant Period").

2.      Luna is a Delaware-incorporated company that represents itself to be a "leader in advanced optical technology," purportedly "providing high performance fiber optic test, measurement and control products for the telecommunications and photonics industries; and distributed fiber optic sensing solutions that measure and monitor materials and structures for applications in aerospace, automotive, oil and gas, security and infrastructure."[1]

3.      The Relevant Period began on May 16, 2022 when the Company published a press release reporting its financial results for the first quarter of 2022 ended March 31, 2022. In relevant part, the press release reported:

   ☐ Total revenues of $22.5 million for the three months ended March 31, 2022, up 7% compared to the three months ended March 31, 2021
   ☐ Gross margin of 64% for the three months ended March 31, 2022, compared to 58% for the three months ended March 31, 2021
   ☐ Operating loss of $2.4 million for the three months ended March 31, 2022, compared to operating loss of $1.6 million for the three months ended March 31, 2021
   ☐ Net income of $9.6 million for the three months ended March 31, 2022, which includes the gain on sale of Luna Labs, compared to net loss of $0.3 million for the three months ended March 31, 2021

4.      However, these statements (and similar statements that the Individual Defendants made throughout the Relevant Period) were materially false and misleading because, in reality, the Company was improperly recognizing revenue in its quarterly and annual reports filed with the SEC, which would later result in Luna being forced to restate such financials.

5.      The truth began to emerge after the market closed on March 12, 2024 when the Company filed a current report on Form 8-K with the SEC revealing that it would need

---

[1]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001239819/000123981923000044/luna-20221231.htm

Verified Shareholder Derivative Complaint

to restate its financial statements for the second and third quarters of 2023 because it had improperly recognized revenues during these periods. In particular, the Company revealed that the Audit Committee "***concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarters ended June 30, 2023, and September 30, 2023***, as previously filed with the Securities and Exchange Commission (the 'SEC'), ***should no longer be relied upon and should be restated***."[2]

6.    Also after the market closed on March 12, 2024, Luna filed a late filing notice on Form NT 10-K with the SEC, which stated, *inter alia*, that Luna was "***unable to file the Form 10-K within the prescribed time period without unreasonable effort or expense***."

7.    On this news, the price per share of the Company's stock fell $2.24, or 35.78%, from a closing price of $6.26 per share on March 12, 2024 to close at $4.02 per share on March 13, 2024.

8.    The truth continued to emerge on March 25, 2024 when, after the market closed, Luna filed a current report on Form 8-K with the SEC, which disclosed that Defendant Graeff had retired from his roles at the Company, effective immediately.

9.    On this news, the price per share of the Company's common stock fell by $0.41, or 11.54%, from a closing price of $3.55 per share on March 25, 2024 to close at $3.14 per share on March 26, 2024.

10.   The truth continued to emerge on April 8, 2024 when the Company revealed that, on April 2, 2024, it had received a written notice of deficiency from NASDAQ related to the Company's failure to file an annual report on Form 10-K with the SEC. The notice revealed that, as a result of the Company's failure to file, the Company was no longer in compliance with NASDAQ's rule requiring companies to file reports in a timely manner to the SEC. Luna represented to shareholders that it would remain listed for at least 60 days from April 2, 2024 and that, in that time, the Company was required to submit a plan to NASDAQ to regain compliance with its listing rule.

---

[2] All emphasis has been added unless otherwise noted herein.

11.     The truth fully emerged on April 19, 2024 when the Company filed another Form 8-K with the SEC which announced that, in addition to non-reliance on its 2Q23 and 3Q23 10-Qs, investors should no longer rely on its previously filed financial statements contained in its 1Q22, 2Q22, 3Q22, FY22, and 1Q23 10-Qs (all defined below) because Luna improperly recognized revenues in each of these 10-Qs too.

12.     On this news, the price per share of the Company's common stock fell $0.78, or 28.1%, from a closing price of $2.77 per share on April 19, 2024 to close at $1.99 on April 25, 2024.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's quarterly and annual reports filed with the SEC during the Relevant Period included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP"); (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.     During the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Luna to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations and material omissions. Indeed, during the Relevant Period, approximately 14,573 shares of Luna's common stock were repurchased,

costing the Company over $94,919. As the Company's stock was actually worth only $1.99 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid for repurchases of its own stock by over $65,918 in total.

15.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

16.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

17.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former President and Chief Executive Officer ("CEO"), and two of its former Chief Financial Officers ("CFOs") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Graeff's, Defendant Nestro's, and Defendant Gomez-Quintero's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the

Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of Luna. Plaintiff has continuously held Luna common stock since before the beginning of the Relevant Period.

### Nominal Defendant Luna

25.    Luna is a Delaware corporation with principal executive offices at 301 1st Street SW, Roanoke, VA 24011. Luna's common stock trades on the Nasdaq Stock Market, LLC ("NASDAQ") under the ticker symbol "LUNA."

**Defendant Graeff**

26.    Defendant Graeff served as the Company's President, CEO, and as a Company director from 2017 until he retired on March 24, 2024.

**Defendant Nestro**

27.    Defendant Nestro served as the Company's CFO from December 2019 until he resigned on October 16, 2023.

**Defendant Gomez-Quintero**

28.    Defendant Gomez-Quintero served as the Company's CFO from October 17, 2023 until he resigned on May 1, 2024.

**Defendant Anderson**

29.    Defendant Anderson has served as a Company director since May 2017. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating & Governance Committee.

30.    The Company's website states the following about Defendant Anderson:

N. Leigh Anderson, Ph.D. joined the Board in May 2017 and is a member of the Board's Audit Committee, Compensation Committee, and Nominating & Governance Committee. He is a Founder and CEO of SISCAPA Assay Technologies, (www.SISCAPA.com). His interests are focused on the proteins of human blood as disease biomarkers, and the introduction of biomarker panels in clinical diagnostics using peptide-level mass spectrometry assays (the SISCAPA technology). Dr. Anderson obtained a BA in Physics from Yale and a Ph.D. in Molecular Biology from Cambridge University, working at the MRC laboratory of Molecular Biology on hemoglobin structure with M. F. Perutz, and later with Sydney Brenner. Subsequently he co-founded (with Dr. Norman Anderson) the Molecular Anatomy Program at the Argonne National Laboratory (Chicago) where his work in the development of 2-D electrophoresis technology earned him the 1983 Pittsburgh Conference Analytical Chemistry Award and the American Association for Clinical Chemistry's Young Investigator Award. After leaving Argonne, Dr. Anderson was a founder and Chief Scientific Officer at Large Scale Biology Corporation, where he co-led a

highly successful Nasdaq IPO in 2000. Beginning work in clinical mass spectrometry in 2002, he founded and is CEO of the Plasma Proteome Institute, a non-profit biomedical scientific research institute in Washington, D.C., and SISCAPA Assay Technologies, Inc., whose core technology he invented and developed. He has served on the boards of directors of three public technology companies including Dade Behring, a global diagnostics company acquired by Siemens, Luna Innovations and Large Scale Biology. He has published 175 papers, been granted 44 US Patents, and was awarded the 2009 Human Proteome Organization (HUPO) Distinguished Achievement Award in Proteomic Science. SISCAPA received the 2014 HUPO Science and Technology Award.[3]

### **Defendant Chanley**

31.    Defendant Chanley has served as a Company director since December 2023.

32.    The Company's website states the following about Defendant Chanley:

David Chanley joined the Luna Board in December 2023. A Co-Founder and Managing Partner with White Hat Capital Partners, he has more than 20 years of experience advising management teams and Boards of technology companies on market positioning, mergers and acquisitions and corporate strategies to create shareholder value. Over the course of his career, Mr. Chanley has demonstrated success helping companies effectively communicate their competitive strengths and investment highlights to the institutional investment community.

Prior to co-founding White Hat Capital Partners LP in 2016, Mr. Chanley was Managing Director and Co-Head of Stifel's Global Technology Investment Banking Group where he oversaw coverage of all the firm's technology sub-sectors including Communications, Electronics & Applied Technologies, Internet & Digital Media, Software & SaaS, Tech-Enabled Services and Telecom. In addition, he served as a Member of the Investment Banking Management Committee as well as the Fairness Committee. In 1999, he joined Thomas Weisel Partners just after its founding and became a Partner in 2007. Earlier in his career, Mr. Chanley was an Investment Banking Associate at Montgomery Securities and a Research Associate at Greenwich Associates.

During his investment banking career, Mr. Chanley developed extensive, deep relationships with corporate executives, board members, senior leaders of major private equity firms, hedge funds, law firms and investment banks. He

---

[3] https://lunainc.com/board-of-directors

Verified Shareholder Derivative Complaint

provided strategic advice to management teams and Boards on a wide range of corporate transactions for leading public Technology companies. Mr. Chanley has also advised numerous public and private technology companies on strategic sales to industry leaders.

Mr. Chanley received his A.B. in Business Economics and Organizational Behavior & Management from Brown University in 1996 and has held various alumni leadership and board positions for Brown over the past 25 years.[4]

**Defendant Coe**

33.    Defendant Coe served as a Company director from May 2021 until she resigned on December 27, 2024.

**Defendant Phelps**

34.    Defendant Phelps has served as Chair of the Board since July 16, 2024 and as a Company director since 2017. He also serves as Chair of the Audit Committee, Chair of the Nominating & Governance Committee, and as a member of the Compensation Committee.

35.    The Company's website states the following about Defendant Phelps:

Warren B.(Barry) Phelps, III was appointed Chair of the Board of Directors on July 16, 2024, has served as a member of our board of directors since 2017. Mr. Phelps serves as the chair of the Board's Audit Committee, chair of the Board's Nominating & Governance Committee, and a member of the Board's Compensation Committee. He has served as Executive Chair of Empower RF Systems, a developer and manufacturer of high power RF amplifiers for the defense and commercial markets, since 2013. Since 2007, Mr. Phelps has served as a director of CarParts.com and its predecessor US AutoParts, a public company. From 2007 to 2017 he was chair of its Audit Committee and a member of the Nominating and Governance Committee. Currently Mr. Phelps serves as CarParts.com's Board Chair ,chair of the Compensation Committee and member of the Audit Committee. From 2000 until his retirement in 2006, Mr. Phelps served in several executive positions for Spirent plc, a leading communications technology company, most recently as President of the Performance Analysis Broadband division. From 1996 to 2000, Mr. Phelps was at Netcom Systems, a provider of network test and

[4] *Id.*

10

measurement equipment, most recently as President and Chief Executive Officer. Prior to that, Mr. Phelps held executive positions, including Chair and Chief Executive Officer, at MICOM Communications and in various financial management roles at Burroughs/Unisys Corporation. Mr. Phelps holds a B.S. degree in mathematics from St. Lawrence University in Canton, New York and an M.B.A. from The University of Rochester in Rochester, New York.[5]

**Defendant Roedel**

36.     Defendant Roedel served as a Company director from 2005 and as the Company's Interim Executive Chairman and Interim President from March 2024 until he resigned from all of his positions at the Company on July 12, 2024.

**Defendant Spiegel**

37.     Defendant Spiegel has served as a Company director since 2015. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and Nominating & Governance Committee.

38.     The Company's website states the following about Defendant Spiegel:

Gary Spiegel joined the Luna's Board of Directors in 2015. He is chairman of the Board's Compensation Committee and a member of the Board's Audit Committee and Nominating & Governance Committee. He has more than 40 years of experience in the photonics industry. He has held positions of vice president, Sales and marketing, senior vice president, Sales and Business Development, and senior vice president, Business Development at Newport Corporation from 2002 to 2013. Mr. Spiegel retired from Newport Corporation in 2014 and is currently a business development consultant. He has a bachelor's degree in industrial marketing from Baruch College of the City University of New York. He also sits on the Board of Telescent Inc., an early stage technology company focused on software defined network cross connect technology and is a member of SPIE Financial Advisory Committee and an honored Fellow of the SPIE and the recipient of its 2020 Directors Award.

**Defendant Vitale**

39.     Defendant Vitale has served as a Company director since September 2019.

---

[5] *Id.*

Verified Shareholder Derivative Complaint

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

40.     By reason of their positions as officers, directors, and/or fiduciaries of Luna and because of their ability to control the business and corporate affairs of Luna, the Individual Defendants owed Luna and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Luna in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Luna and its shareholders so as to benefit all shareholders equally.

41.     Each director and officer of the Company owes to Luna and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Luna, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of Luna were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Luna, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual

Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

45.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

46.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Luna were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to Luna's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Luna conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Luna and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Luna's operations would comply with all applicable laws and Luna's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47.      Each of the Individual Defendants further owed to Luna and the shareholders the duty of loyalty requiring that each favor Luna's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

48.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Luna and were at all times acting within the course and scope of such agency.

49.      Because of their advisory, executive, managerial, directorial, and controlling

positions with Luna, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Luna.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Luna was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Luna and was at all times acting within the course and scope of such agency.

**LUNA'S CODE OF CONDUCT**

56.    Luna's Code of Business Conduct and Ethics (the "Code of Conduct") states that it is "designed to deter wrongdoing" and to promote the following:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Compliance with applicable laws, rules and regulations;
- Full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission ("**SEC**") and in our other public communications;
- Accountability for adherence to this Code; and
- Prompt internal reporting of violations of this Code

57.    In the section "Avoiding Conflicts of Interest," the Code of Conduct states the following, in relevant part:

All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior. Even well intended actions can potentially violate applicable laws or this Code and may result in negative consequences for you or the Company.

Your decisions and actions in the course of your employment with the Company should be based on the best interests of the Company, and not based on personal relationships or benefits. You should seek to avoid situations where your personal activities and relationships conflict, or appear to conflict, with the interests of the Company, except under guidelines approved by the Board of Directors. This includes situations where you may have or appear to have an indirect conflict through, for example, a significant other or relative or other persons or entities with which you have a relationship. A conflict may also arise when you take actions or have interests that make it difficult for you to perform your work for the Company objectively and effectively. You must disclose to your supervisor any interest that you have that may, or may appear to, conflict with the interests of the Company.

58.     In the section "Compliance with rules, controls, and procedures," the Code of Conduct states:

It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting. If you have responsibility for or any involvement in financial reporting or accounting, you should have an appropriate understanding of, and you should seek in good faith to adhere to, relevant accounting and financial reporting principles, standards, laws, rules and regulations and the Company's financial and accounting policies, controls and procedures. If you are a senior officer, you should seek to ensure that the internal controls and procedures in your business area are in place, understood and followed.

59.     In the section "Accuracy of records and reports," the Code of Conduct states the following, in relevant part:

It is important that those who rely on records and reports (including, but not limited to, our investors, analysts, management and auditors) have complete, accurate and timely information. False, misleading or incomplete information undermines the Company's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should

make an inquiry or review adequate to establish a good faith belief in their accuracy.

Even if you are not directly involved in financial reporting or accounting, you are likely involved with financial records or reports of some kind, such as a voucher, time sheet, invoice or expense report. In addition, most employees have involvement with product, marketing or administrative activities which can affect our reported financial condition or results. Therefore, the Company expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.

60. Regarding retaliation, the Code of Conduct states:

Reprisals, threats, retribution or retaliation against any person who has in good faith reported a violation or a suspected violation of law, this Code or other Company policies, or against any person who is assisting in any investigation or process with respect to such a violation, are prohibited.

61. In the section "Obligation to report potential violations," the Code of Conduct states the following, in relevant part:

Dishonest or inaccurate reporting can lead to civil or even criminal liability for you and the Company. You are required to promptly report any case of suspected financial or operational misrepresentation or impropriety to the Compliance Officer or Chief Financial Officer as appropriate. Concerns or complaints may also be submitted anonymously and confidentially to the Audit Committee via the Luna Innovations Corporate Governance Hotline at (800) 503-1833.

62. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Luna's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an

honest and ethical manner, and properly report violations of the Code of Conduct.

## LUNA'S AUDIT COMMITTEE CHARTER

63.    Luna also maintains an Audit Committee Charter which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following under "Purpose":

> The purpose of the Audit Committee of the Board of Directors of Luna Innovations Incorporated (the "Company") shall be to:
>
> Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;
>
> Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, (iv) the Company's internal accounting and financial controls, and (v) the Company's internal audit function, if applicable;
>
> Prepare the Audit Committee report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;
>
> Provide the Company's Board with the results of its monitoring and recommendations derived therefrom; and
>
> Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.
>
> In addition, the Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board of Directors may from time to time prescribe, or as may be required by law from time to time.
>
> The Board and management shall ensure that the Audit Committee has adequate funding and other resources and authority to discharge its responsibilities as determined by the Audit Committee.

64.     With respect to the Audit Committee's responsibilities, the Audit Committee Charter states the following, in relevant part:

> Reviewing on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

***

> Recommending to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by Auditing Standard 1301, and (3) with the independent auditor concerning the independent auditor's independence;

> Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

> Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

> Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

> Reviewing before release the Company's earnings releases, as well as the substance of financial information and earnings guidance that may be disclosed on earnings calls or disclosed to analysts; the Chairman of the Committee may represent the entire Committee for purposes of this review;

Reviewing and discussing with management and the Company's independent auditors the preparation and content of any officer certifications required by the Sarbanes-Oxley Act of 2002 or the SEC to be filed with the Company's Quarterly Report on Form 10-Q, Annual Report on Form 10-K or any other periodic report;

Discussing with management and, if applicable, internal audit representatives the activities, organizational structure and qualifications of the Company's internal audit function;

65.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

### *Luna's Business*

66.    Luna is a Delaware-incorporated company that represents itself to be a "leader in advanced optical technology," purportedly "providing high performance fiber optic test, measurement and control products for the telecommunications and photonics industries; and distributed fiber optic sensing solutions that measure and monitor materials and structures for applications in aerospace, automotive, oil and gas, security and infrastructure."[6]

---

[6]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001239819/000123981923000044/lu

67.    The Company's website states that its "key industries" are aerospace, communications, automotive, civil and geotechnical, energy, and industrial and manufacturing. With respect to the Company's involvement in the automotive industry, Luna's website states the following:

> As the automotive industry transitions to electrical drivetrains and advanced lightweight materials, new approaches to test and manufacturing are needed to deliver new technologies to the market that are safe, reliable and competitive.

> Luna's ODiSI high-definition distributed sensing system is a new and valuable tool for the integration of new lightweight materials and electrical powertrains. Low-profile, flexible fiber optic sensors can be applied to challenging geometries, deliver complete data maps, and are immune to the interference and hazards associated with instrumenting electrical power components.

> When very precise density or thickness measurement is required, whether for quality control or for process monitoring, Luna's TGauge terahertz imaging is able to provide data and a level of accuracy not available with legacy NDT technologies.

68.    ODiSI stands for Optical Distributed Sensor Interrogator. Moreover, "TGauge terahertz imaging" means a control unit ("TCU") that "deliver[s] precisely controlled terahertz waveforms for fast, precise, and reliable operation." The Company represents that "[t]he T-Ray 5600 is ideal for thickness measurements, measurements of extruded shapes, density and basis weight measurements and ultra high speed measurements of moving samples."

### *Luna's Reporting Requirements*

69.    Luna, as a publicly traded company, is required by the U.S. federal securities laws and SEC regulations to regularly report its financial results. Indeed, the Company is subject to significant disclosure requirements in its periodic reports required to be filed

---

na-20221231.htm

Verified Shareholder Derivative Complaint

with the SEC, including Luna's annual report submitted on Form 10-K and its quarterly reports submitted on Forms 10-Q. The SEC imposes strict filing deadlines for such reports, and the consequences for missing such a deadline can severely harm the company.

70.     If a publicly traded company fails to file its required SEC reports by the SEC's imposed deadlines, the company is in violation of Section 13(a) of the Exchange Act, meaning the SEC could, *inter alia*, suspend trading in the company's securities.

71.     In addition to the SEC, NASDAQ also imposes strict policies with respect to companies that fail to timely file their periodic reports. If a company fails to comply with a filing deadline, NASDAQ will issue the company a notification of deficiency and give the company 60 days to provide NASDAQ with a plan of compliance. If the company fails to comply with these additional requirements, NASDAQ may begin the process of delisting the company. Although the company may appeal the delisting decision to a NASDAQ Hearings Panel, an appeal does not halt the delisting process.

72.     NASDAQ rules further provide that a company facing delisting must publish a press release disclosing the deficiency and offer details about their plan to complete their filings in a timely manner and become current with them. In addition, when a company has experienced a filing deficiency, NASDAQ will add an "E" next to the company's trading symbol to reflect such deficiency.

73.     For a company to avoid being delisted, it must give the NASDAQ Hearings Panel an estimated date for compliance, a schedule of actions, and information about any necessary adjustments or restatements.

**False and Misleading Statements**

***May 16, 2022 Press Release, Earnings Call, and Form 10-Q***

74.     The Relevant Period began on May 16, 2022 when the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the first quarter of 2022 ended March 31, 2022 ("1Q22") (the "1Q22 Release"). In relevant part, the 1Q22 Release stated:

 Total revenues of $22.5 million for the three months ended March 31, 2022, up 7% compared to the three months ended March 31, 2021

 Gross margin of 64% for the three months ended March 31, 2022, compared to 58% for the three months ended March 31, 2021

 Operating loss of $2.4 million for the three months ended March 31, 2022, compared to operating loss of $1.6 million for the three months ended March 31, 2021

 Net income of $9.6 million for the three months ended March 31, 2022, which includes the gain on sale of Luna Labs, compared to net loss of $0.3 million for the three months ended March 31, 2021

75.    The 1Q22 Release also represented that the 7% quarter over quarter increase in revenue was "primarily due to revenue generated by the Lios acquisition" and that the increase in gross margin was "driven primarily by favorable product mix."

76.    In addition, the 1Q22 Release quoted Defendant Graeff, the Company's then-CEO, who stated, "I'm very pleased with our first-quarter performance as the Luna team delivered a solid start to 2022. [] *We surpassed the top end of the Q1 revenue guidance we provided in March, while completing significant events including the divestiture of Luna Labs, the acquisition of Lios and the complete absorption of OptaSense into our operations.*"

77.    Also in the 1Q22 Release, Defendant Graeff touted Luna's purportedly favorable 1Q22 results and attributed them to Luna's sales execution and strategic decisions. In relevant part, he stated, "As a result of the moves we've made, today Luna is a company with blue-chip customers, over a dozen of which are long-term, resulting in many large, multi-unit purchase orders. For example, we've gone from shipping one or two boxes to being completely integrated into Lockheed Martin's F-35 global program. I'm incredibly proud of the team for managing through the numerous puts and takes over the past six quarters, as we solidify Luna as a clear leader and a company fully focused on Enabling the Future with Fiber."

78.    The same day, the Company hosted an earnings call with analysts and

investors to discuss its 1Q22 financial results. During the call, which was hosted by Defendants Graeff and Nestro, Defendant Graeff emphasized that the Company's revenue growth was "above the first quarter guidance range we provided on our Q4 call" and stated, "In communications testing, revenues grew double digits compared to Q1 2021, driven by record sales for Luna's high speed communications test instruments, the OVA and OBR." Later during the call, Defendant Nestro reported that revenue increases were "primarily due to revenue generated by our LIOS acquisition."

79.    Also on May 16, 2022, the Company filed a quarterly report on Form 10-Q with the SEC to report its financial results for 1Q22 (the "1Q22 10-Q"), which was signed by Defendant Nestro and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Graeff and Nestro attesting that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." In addition, these SOX certifications represented to investors that the Company's disclosure controls and procedures and internal control over financial reporting "provide[s] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]" It also reported that Luna's disclosure controls and procedures were "effective." In relevant part, the 1Q22 10-Q stated:

> We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are controls and other procedures that are designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures also include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is

accumulated and communicated to the company's management, including its
principal executive and principal financial officers, as appropriate to allow
timely decisions regarding required disclosure.

Management recognizes that any controls and procedures, no matter how well
designed and operated, can provide only reasonable assurance of achieving
their objectives and management necessarily applies its judgment in
evaluating the cost-benefit relationship of possible controls and procedures.
In addition, the design of any system of controls also is based in part upon
certain assumptions about the likelihood of future events, and there can be no
assurance that any design will succeed in achieving its stated goals under all
potential future conditions; over time, controls may become inadequate
because of changes in conditions, or the degree of compliance with policies
or procedures may deteriorate. Because of the inherent limitations in a control
system, misstatements due to error or fraud may occur and not be detected.

Under the supervision and with the participation of our management,
including our President and Chief Executive Officer and our Chief Financial
Officer, we evaluated the effectiveness of the design and operation of our
disclosure controls and procedures as of the end of the period covered by this
quarterly report. Based on this evaluation, our President and Chief Executive
Officer and our Chief Financial Officer have concluded that, as of March 31,
2022, our disclosure controls and procedures were effective.

80.     In the 1Q22 10-Q, Luna also reported $22.48 million in revenues and $9.58
million in net income for the quarter.

81.     The statements in ¶¶74-80 above were materially false and misleading and
failed to disclose, *inter alia*, that: (1) the Company's 1Q22 10-Q included unearned
revenues that should not have been recognized; (2) due to the foregoing, the Company
would need to restate these financial results; (3) the Company's disclosure controls and
procedures did not provide reasonable assurance with respect to the reliability of financial
reporting and the preparation of financial statements for external purposes in accordance
with GAAP; (4) the Company's disclosure controls and procedures were not effective; and
(5) due to the foregoing,  Defendants crediting the Company's quarterly revenue growth to
the Lios acquisition and Luna's positive financial results to organic factors, were materially

false and misleading and/or lacked a reasonable basis at all times in that they failed to disclose that these positive results were only reached because the Company had improperly recognized its revenue.

### *August 11, 2022 Press Release, Earnings Call, and Form 10-Q*

82.    On August 11, 2022, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the second quarter of 2022 ended June 30, 2022 ("2Q22") (the "2Q22 Release"). In relevant part, the 2Q22 Release stated:

 Total revenues of $26.2 million for the three months ended June 30, 2022, up 19% compared to the three months ended June 30, 2021

 Gross margin of 61% for the three months ended June 30, 2022, compared to 57% for the three months ended June 30, 2021

 Net loss of $2.4 million for the three months ended June 30, 2022, compared to net loss of $0.2 million for the three months ended June 30, 2021; primarily due to $1.8 million benefit from tax and discontinued operations in the second quarter 2021.

83.    The 2Q22 Release also represented that the 19% comparable same quarter last year growth in revenue was "primarily due to revenue generated by the Lios acquisition" and that the increase in gross margin was "driven primarily by favorable product mix."

84.    The 2Q22 Release also quoted Defendant Graeff, who touted that Luna's financial results were the result of organic factors, including the Company's management team's "focus and execution." In relevant part, the 2Q22 Release stated:

As I reflect on the first half of 2022, I'm pleased with the team's top-line performance and ability to navigate ongoing macroeconomic and market factors. [] We achieved double-digit revenue growth for the second-quarter in nearly all of our product lines, and I'm proud of the Luna team for their accomplishments. The team's focus and execution will carry us through the remainder of 2022 and will allow us to achieve growth in each business. This, combined with strong bookings, gives me the confidence to reaffirm our 2022 outlook.

85.    The same day, the Company hosted an earnings call with analysts and investors to discuss its 2Q22 financial results. During the call, which was hosted by Defendants Graeff and Nestro, Defendant Graeff represented that "for the second quarter 2022, the revenue growth, I just mentioned was driven by a full quarter of LIOS contribution and solid commercial sales in the legacy sensing and comms test business. In fact, our bookings growth once again exceeded our revenue growth in Q2 2022." In addition, he stated, "Let's dig a little deeper in the sensing, which you may recall is where we use the fiber as the physical sensor to create smart materials and structures. Revenues grew double-digit versus Q2 last year, driven both by a full quarter of LIOS as well as strong demand for legacy Luna products. In fact, Luna Legacy ODiSI, Hyperion and terahertz pipelines each contributed double-digit sales growth."

86.    Also on August 11, 2022, the Company filed a quarterly report on Form 10-Q with the SEC to report its financial results for 2Q22 (the "2Q22 10-Q"), which was signed by Defendant Nestro and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Nestro attesting to its accuracy. The 2Q22 10-Q also represented that "as of June 30, 2022, [Luna's] disclosure controls and procedures were effective."

87.    In the 2Q22 10-Q, Luna also reported $26.12 million in revenues and $2.35 million in net loss for the quarter.

88.    The statements in ¶¶82-87 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 2Q22 10-Q included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and

prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 10, 2022 Press Release, Earnings Call, and Form 10-Q*

89.    On November 10, 2022, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the third quarter of 2022 ended September 30, 2022 ("3Q22") (the "3Q22 Release"). In relevant part, the 3Q22 Release stated:

◻ Total revenues of $29.2 million, up 43% year-over-year.

◻ Total revenues in constant currency of $30.1 million; up 48% year-over-year

◻ Gross margin of 58%, compared to 62% for the prior-year period.

◻ Net income of $1.2 million, compared to net income of $0.4 million for the prior-year period.

90.    The 3Q22 Release quoted Defendant Graeff, who touted the Company's purportedly positive 3Q22 financial results and represented that they could be attributed to the "strategic moves and investments that the Company had made over the past two years. In relevant part, the 3Q22 Release stated:

I'm extremely pleased with our performance in Q3, achieving over 40% growth in revenues and more than doubling Adjusted EBITDA versus last year. [] The team was able to achieve these strong financial results while still navigating a challenging supply chain and economic environment. And I'm particularly pleased that this quarter is more normative, positively reflecting the meaningful strategic moves and investments we've made over the past two years to refine Luna's focus and realign our organization appropriately. Today, Luna Innovations is uniquely positioned to offer a breadth of solutions and capabilities in fiber technology.

91.    In addition, Defendant Graeff stated that "[w]ith three quarters now behind us, we feel very comfortable that we will finish 2022 within the ranges that we provided on our March earnings call."

92.    Also on November 10, 2022, the Company filed a quarterly report on Form

10-Q with the SEC to report its financial results for 3Q22 (the "3Q22 10-Q"), which was signed by Defendant Nestro and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Nestro attesting to its accuracy. The 3Q22 10-Q also represented that "as of September 30, 2022, [Luna's] disclosure controls and procedures were effective."

93.    In the 3Q22 10-Q, Luna also reported $29.15 million in revenues and $1.19 million in net income for the quarter.

94.    The statements in ¶¶89-93 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 3Q22 10-Q included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *March 14, 2023 Press Release, Earnings Call, and Form 10-K*

95.    On March 14, 2023, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the fourth quarter ("4Q22") and full year ended December 31, 2022 (the "2022 Fiscal Year") (the "4Q22 Release"). In relevant part, the 4Q22 Release stated:

**Q4 Financial Highlights**

☐ Revenues of $31.7 million, up 31% year over year

    o   Revenues in constant currency of $32.5 million; up 34% year over year

☐ Gross margin of 61%, compared to 58% for the prior year.

☐ Net income of $0.9 million, compared to net income of $1.6 million for

the prior year.

. . .

**Full-Year Financial Highlights**

☐ Revenues of $109.5 million, up 25% year over year

    o  Revenues in constant currency of $111.9 million; up 28% year over year

☐ Gross margin of 61%, compared to 59% for the prior year.

☐ Net income of $9.3 million, compared to net income of $1.4 million for the prior year.

96.    In the 4Q22 Release, Defendant Graeff noted that the Company's positive 2022 financial performance could largely be attributed to execution on Luna's five-year plan. In relevant part, he stated, "2022 was a transformational year for Luna representing the culmination of execution on the five-year strategic plan we outlined in 2017, thereby creating a pure-play fiber optics company."

97.    During an earnings call the Company hosted the same day to discuss the 4Q22 and 2022 Fiscal Year results, Defendant Graeff pointed to the Company's revenue growth and stated, "I'm pleased that the growth was driven not only by last year's acquisition, but also by very strong growth in our legacy business . . . You can see that the strategic changes we made resulted in a stronger flow through of our top line growth of profit."

98.    Defendant Graeff also provided credit to the Company's "execution" when he stated "[t]hrough last year, you've heard me say that investment was critical to both our top and bottom line growth. Our financials are proving that case. We're delivering top line growth and our gross margin and adjusted EBITDA demonstrate that we are creating pull through leverage to the bottom line. We have continued strong execution against our strategy and have enjoyed consecutive quarters of positive leverage."

99.    Also during the earnings call, Defendant Nestro stated that the increase in the Company's revenue "was driven largely by the Lios acquisition in strength and communications test products" and that "[t]he increase in revenues year-on-year was driven largely by the Lios acquisition, increasing adoption of our Terahertz technology,

and strengthen in communications test products."

100.   Two days later, on March 16, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"), which was signed by Defendants Graeff, Nestro, Anderson, Phelps, Coe, Spiegel, Vitale, and Roedel and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Nestro attesting to its accuracy. The 2022 10-K also represented that "as of December 31, 2022, [Luna's] disclosure controls and procedures were effective."

101.   In the 2022 10-K, Luna also reported $109.49 million in revenues and $9.28 million in net income for the 2022 Fiscal Year.

102.   With respect to Luna's process for reporting its financials, the 2022 10-K stated the following, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed, under the supervision of our principal executive and principal financial officers, and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the
> reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America ("GAAP").
>
> Based on our evaluation[,] . . . our President and Chief Executive officer, and our Chief Financial Officer concluded that our internal control over financial reporting was effective as of December 31, 2022 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

103.   The statements in ¶¶95-102 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 2022 10-K included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial

reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 20, 2023 Proxy Statement*

104.    On April 20, 2023, the Company filed a Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited shareholders to vote to, *inter alia*, approve, on an advisory basis, the compensation of Luna's named executive officers, including Defendants Graeff and Nestro.

105.    With respect to the Company's revenue and net income for the 2022 Fiscal Year, the 2023 Proxy Statement repeated substantially the same misstatements as set forth in the 2022 10-K. The 2023 Proxy Statement also repeated the below statement from the 2022 10-K regarding the adequacy of Luna's internal controls:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed, under the supervision of our principal executive and principal financial officers, and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America ("GAAP").
>
> Based on our evaluation[,] . . . our President and Chief Executive officer, and our Chief Financial Officer concluded that our internal control over financial reporting was effective as of December 31, 2022 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

106.    The statements in ¶105 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's financial results for the 2022 Fiscal Year included unearned revenues that should not have been recognized under GAAP; (2) due to

the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; and (4) the Company's disclosure controls and procedures were not effective. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### May 9, 2023 Press Release and Form 10-Q

107.   On May 9, 2023, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the first quarter of 2023 ended March 31, 2023 ("1Q23") (the "1Q23 Release"). In relevant part, the 1Q23 Release stated:

**Q1 Highlights**

☐ Total revenues of $25.0 million, up 11% year over year

☐ Total revenues in constant currency of $25.3 million; up 13% year-over-year

☐ Gross margin of 60%, compared to 64% for the prior year.

☐ Net loss of $1.8 million, compared to net income of $9.6 million for the prior year, which included the gain on sale of Luna Labs

108.   The 1Q23 Release quoted Defendant Graeff, who alleged that the Company's strong revenue growth was caused by "the foundational work [Luna] did in 2022." In relevant part, he stated:

I'm pleased that we were able to drive strong revenues in the first quarter, which is cyclically one of our softest revenue quarters. [] Because of the foundational work we did in 2022, we've entered 2023 with an integrated organizational structure, proven systems, and best practices. ***With those pieces in place, we were able to achieve the top end of revenue guidance for the quarter***.

109.   Also on May 9, 2023, the Company filed its quarterly report on Form 10-Q

with the SEC for 1Q23 (the "1Q23 10-Q"), which was signed by Defendant Nestro and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Nestro attesting to its accuracy. The 1Q23 10-Q also represented that "as of March 31, 2023, [Luna's] disclosure controls and procedures were effective."

110.    In the 1Q23 10-Q, Luna also reported $25.04 million in revenues and $1.84 million in net loss for the quarter.

111.    The statements in ¶¶107-110 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 1Q23 10-Q included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *August 10, 2023 Press Release, Earnings Call, and Form 10-Q*

112.    On August 10, 2023, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the second quarter of 2023 ended June 30, 2023 ("2Q23") (the "2Q23 Release"). In relevant part, the 2Q23 Release stated:

**Q2 Highlights**
☐ Total revenues of $29.2 million, up 11% year over year
☐ Gross margin of 58%, compared to 61% for the prior year.
☐ Net loss of $1.6 million, compared to net loss of $2.4 million for the prior year.

113.    The 2Q23 Release also reported that "[g]ross profit of $31.8 million for the six months ended June 30, 2023 increased from $30.2 million for the six months ended

June 30, 2022 primarily due to higher sales."

114.   The same day, the Company hosted an earnings call with analysts and investors to discuss its 2Q23 results. During the call, Defendant Nestro stated that "revenue this quarter was $29.2 million, an increase of 11% year-over-year. The increase was driven largely by performance in the Sensing business, specifically organic growth from OptaSense and LIOS."

115.   Also on August 10, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q23 (the "2Q23 10-Q"), which was signed by Defendant Nestro and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Nestro attesting to its accuracy. The 2Q23 10-Q also represented that "as of June 30, 2023, [Luna's] disclosure controls and procedures were effective."

116.   In the 2Q23 10-Q, Luna also reported $29.16 million in revenues and $1.59 million in net loss for the quarter.

117.   The statements in ¶¶112-116 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 2Q23 10-Q included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 14, 2023 Press Release, Earnings Call, and Form 10-Q*

118.   On November 14, 2023, the Company published a press release (which it also filed with the SEC as an attachment to a Form 8-K) reporting its financial results for the third quarter of 2023 ended September 30, 2023 ("3Q23") (the "3Q23 Release"). In

relevant part, the 3Q23 Release stated:

**Q3 Highlights**

☐ Total revenue of $30.7 million, up 5% year over year
☐ Gross margin of 57%, compared to 58% for the prior year.
☐ Net income of $0.5 million, compared to net income of $1.2 million for the prior year.

119.    The 3Q23 Release quoted Defendant Graeff, who stated: "We delivered solid performance this quarter in spite of continued macroeconomic headwinds. [] We realized multiple significant wins in our Sensing business, providing further proof of the breadth of applications and abundance of opportunities for our fiber sensing solutions. We also recognized a particularly strong showing from our Communications Test business, where we saw significant increase in revenue after realizing moderate recovery from the headwinds this business faced last quarter."

120.    The same day, the Company hosted an earnings call with analysts and investors to discuss its 3Q23 financial results. During the call, Defendant Gomez-Quintero stated, "Now, let me provide some additional detail on our Q3 results. Third quarter revenue was $30.7 million, an increase of 5% year-over-year. The increase was driven largely by strong performance from our Comms Test business, specifically a rebound in sales to our government and defense customers as that business continues to recover from the headwinds we mentioned last quarter."

121.    Also on November 14, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q23 (the "3Q23 10-Q"), which was signed by Defendant Gomez-Quintero and contained substantially the same SOX certifications as the 1Q22 10-Q signed by Defendants Graeff and Gomez-Quintero attesting to its accuracy. The 3Q23 10-Q also represented that "as of September 30, 2023, [Luna's] disclosure controls and procedures were effective."

122.    In the 3Q23 10-Q, Luna also reported $30.07 million in revenues and $461,000 in net income for the quarter.

123.    The statements in ¶¶118-122 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's 3Q23 10-Q included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

### *March 12, 2024 Form 8-K and Notice of Late Filing*

124.    The truth began to emerge after the market closed on March 12, 2024 when the Company filed a current report on Form 8-K with the SEC revealing that it would need to restate its financial statements for 2Q23 and 3Q23 (the "First Restatement Announcement") because it had improperly recognized revenues during these periods.

125.    In relevant part, the First Restatement Announcement stated the following:

A Special Committee of the Board of Directors (the "Board") of Luna Innovations Incorporated (the "Company") is conducting an independent review, with the assistance of external legal and financial advisors, *of certain transactions for which revenue was recognized in the second and third quarters of 2023 that did not qualify for revenue recognition under U.S. generally accepted accounting principles*. The Special Committee is examining the circumstances surrounding these issues and is evaluating, among other things, the Company's disclosure controls and internal control over financial reporting and whether changes in accounting policies or other policies are necessary.

While the independent review is ongoing, on March 12, 2024, the Audit Committee (the "Audit Committee") of the Board, *based on preliminary findings of the review, and after consultation with, the Company's management and the Special Committee's external legal and financial*

***advisors, concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarters ended June 30, 2023, and September 30, 2023***, as previously filed with the Securities and Exchange Commission (the "SEC"), ***should no longer be relied upon and should be restated***.

***In connection with the independent review, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023, and September 30, 2023, and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of those dates***. Based on this assessment, the Company's disclosure controls and procedures were ineffective for the quarters ended June 30, 2023, and September 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and will report its remediation plan and further information regarding the material weaknesses when it reports its restated results for the affected periods.

As the independent review remains ongoing, the Company has not yet determined the full extent of the impact on the second and third quarters of 2023 and whether and to what extent there may be an impact on financial statements for any other periods.

The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

126.   Also after the market closed on March 12, 2024, Luna filed a late filing notice on Form NT 10-K with the SEC (the "Notice of Late Filing"). The Notice of Late Filing stated the following, in relevant part:

Luna Innovations Incorporated (the "Company") is filing this Notification of Late Filing on Form 12b-25 with respect to its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Form 10-K"). ***The Company is unable to file the Form 10-K within the prescribed time period without unreasonable effort or expense***.

As announced on March 12, 2024, a Special Committee of the Company's Board of Directors (the "Special Committee") is conducting an independent review, with the assistance of external legal and financial advisors, ***of certain transactions for which revenue was recognized in the second and third quarters of 2023 that did not qualify for revenue recognition under U.S.***

*generally accepted accounting principles*. The Special Committee is examining the circumstances surrounding these issues and is evaluating, among other things, the Company's disclosure controls and internal control over financial reporting and whether changes in accounting policies or other policies are necessary. The Company currently anticipates reporting material weaknesses in internal controls related to evaluating customer arrangements for proper revenue recognition and other controls and will be working to remediate these issues.

Additional time is needed to complete tasks and steps necessary to prepare and finalize the Company's annual financial statements and other disclosures required to be included in the Form 10-K, as well as to complete the ongoing review of recognition of revenue. There can be no assurance as to how long the review will take or when the Company will
be able to complete the preparation and filing of the Form 10-K.

However, the Company currently does not expect to file the Form 10-K within the extension period of fifteen calendar days provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended. In addition, the review is ongoing and the Company has not yet determined the full extent of the impact on the second and third quarters of 2023 and whether and to what extent there may be an impact on financial statements for any other periods.

127.  On this news, the price per share of the Company's stock fell $2.24, or 35.78%, from a closing price of $6.26 per share on March 12, 2024 to close at $4.02 per share on March 13, 2024.

**March 25, 2024 Form 8-K**

128.  The truth continued to emerge on March 25, 2024 when, after the market closed, Luna filed a current report on Form 8-K with the SEC (the "March 25th Form 8-K"), which disclosed that Defendant Graeff had retired from his roles at the Company, effective immediately. In relevant part, the March 25th Form 8-K stated:

*Retirement of Scott Graeff as President and Chief Executive Officer and as a Board Member*

On March 24, 2024, **Scott Graeff retired as the President and Chief Executive Officer of the Company and as a member of the Board, effective immediately**. After consideration of various alternatives, including

termination with or without cause, *the Board exercised its discretion in determining that it was in the best interests of the Company and its stockholders to accept Mr. Graeff's retirement and provide benefits to Mr. Graeff in exchange for his continued assistance and compliance with other obligations as set forth in a separation agreement* (the "Separation Agreement"), which the Company and Mr. Graeff entered into on March 24, 2024 (the "Separation Date").

Subject to Mr. Graeff's release of claims and his compliance with the Separation Agreement and his continuing obligations to the Company under his employment agreement and Confidential Information, Inventions Assignment, Non-competition and Non-Solicitation Agreement, the Company has agreed to provide Mr. Graeff with the following severance benefits: (a) severance payments in the form of continuation of his base salary for a period of nine months following the Separation Date, payable in accordance with the Company's normal payroll practices, (b) payment of his COBRA premium, if applicable, for up to nine months, and (c) accelerated vesting of 10,000 shares underlying Mr. Graeff's unvested RSUs. The remainder of Mr. Graeff's unvested equity awards were forfeited as of the Separation Date. The Separation Agreement also contains certain covenants that are binding upon Mr. Graeff, *including a covenant to cooperate with the Company in connection with any investigation of any claims or demands asserted against it and with respect to matters arising from events that occurred during his period of employment with the Company*. Mr. Graeff also agreed to refrain from taking certain actions regarding the Company and its management and stockholders in light of Mr. Graeff's status as a holder of the Company's common stock. The Separation Agreement also contains a release of claims in favor of the Company, subject to customary exceptions, and mutual covenants not to disparage, subject to certain exceptions. In addition, the Separation Agreement contains clawback provisions pursuant to which, in addition to any required clawback under applicable law or listing requirements and the Company's clawback policies, 100% of all cash severance payments and accelerated RSUs provided to Mr. Graeff under the Separation Agreement are subject to clawback upon (a) the Board's determination, in its reasonable good faith discretion, that Mr. Graeff engaged in conduct that constituted "Cause" under his employment agreement, (b) the Board's determination, in its reasonable good faith discretion, that Mr. Graeff materially breached his continued obligations to the Company, or (c) a finding by a court that Mr. Graeff engaged in bad faith conduct.

129.  On this news, the price per share of the Company's common stock fell by

$0.41, or 11.54%, from a closing price of $3.55 per share on March 25, 2024 to close at $3.14 per share on March 26, 2024.

### *April 8, 2024 Notice of Deficiency*

130.    The truth continued to emerge on April 8, 2024 when the Company revealed that, on April 2, 2024, it had received a written notice of deficiency from NASDAQ related to the Company's failure to file an annual report on Form 10-K with the SEC. The notice revealed that, as a result of the Company's failure to file, the Company was no longer in compliance with NASDAQ's rule requiring companies to file reports in a timely manner to the SEC. Luna represented to shareholders that it would remain listed for at least 60 days from April 2, 2024 and that, in that time, the Company was required to submit a plan to NASDAQ to regain compliance with its listing rule.

### THE TRUTH FULLY EMERGES

131.    The truth fully emerged on April 19, 2024 when the Company filed another Form 8-K with the SEC which announced that, in addition to non-reliance on its 2Q23 and 3Q23 10-Qs, investors should no longer rely on its previously filed financial statements contained in its 1Q22, 2Q22, 3Q22, FY22, and 1Q23 10-Qs (the "Second Restatement Announcement") because Luna improperly recognized revenues in each of these 10-Qs too.

132.    In relevant part, the Second Restatement Announcement stated:

As previously reported in the Current Report on Form 8-K (the "Initial 8-K") filed by Luna Innovations Incorporated (the "Company") with the Securities and Exchange Commission (the "SEC") on March 12, 2024, a Special Committee (the "Special Committee") of the Board of Directors (the "Board") of the Company has been conducting an independent review, with the assistance of external legal and financial advisors, of certain revenue recognition matters in connection with the Company's previously issued financial statements. As disclosed in the Initial 8-K, the Audit Committee (the "Audit Committee") of the Board, based on preliminary findings of the review, and after consultation with the Company's management and the Special Committee's external legal and financial advisors, concluded that the Company's previously issued interim unaudited condensed consolidated

financial statements for the quarters ended June 30, 2023 and September 30, 2023 (the "Q2 and Q3 2023 Financial Statements"), as previously filed with the SEC, *should no longer be relied upon and should be restated due to the recognition of revenue with respect to certain transactions in those periods that did not qualify for revenue recognition under U.S. generally accepted accounting principles*.

While the independent review is continuing, on April 15, 2024, the Audit Committee, based on additional preliminary findings of the review, and after consultation with the Company's management and the Special Committee's external legal and financial advisors, concluded that the Company's previously issued audited consolidated financial statements as of and for the year ended December 31, 2022 (the "2022 Annual Financial Statements"), as well as the Company's previously issued interim unaudited condensed consolidated financial statements as of and for each of the three months ended March 31, 2022, the three and six months ended June 30, 2022 and the three and nine months ended September 30, 2022 (collectively, the "2022 Interim Financial Statements" and, together with the 2022 Annual Financial Statements, the "2022 Financial Statements") as well as the interim unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2023 (together with the Q2 and Q3 2023 Financial Statements and the 2022 Financial Statements, the "Affected Financial Statements"), should no longer be relied upon and should be restated due to identified accounting errors in each of the Affected Financial Statements relating to revenue recognition. Similarly, *any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company's financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon. In addition, the report of Ernst & Young LLP included in the previously issued 2022 Annual Financial Statements should no longer be relied upon*. In addition, the Company is assessing the effect of the matters identified to date on the Company's internal control over financial reporting and its disclosure controls and procedures. In connection with the review and the identification of the accounting errors described in this report, *the Audit Committee identified material weaknesses in the Company's internal control over financial reporting that existed during the periods covered by each of the Affected Financial Statements*, and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of each quarter end included in the Affected Financial Statements (the "Affected Balance Sheet Dates"). Based on this assessment, the Audit Committee has determined that the

Company's disclosure controls and procedures were ineffective as of each of the Affected Balance Sheet Dates. The Audit Committee has also concluded that, based on its determination that the Company's internal control over financial reporting was not effective as of December 31, 2022, Management's Report on Internal Control over Financial Reporting included in the Company's Annual Report on Form 10-K for the year ended December 31, 2022 should no longer be relied upon. The description of the restatements and accounting errors in this report is preliminary, unaudited and subject to further change in connection with the ongoing review and the completion of the restatements of the Affected Financial Statements. Additionally, as the independent review remains ongoing, the Company has not yet determined the full extent of the impact on the Affected Financial Statements and whether and to what extent there may be an impact on financial statements for any other periods. Accordingly, there can be no assurance as to the actual effects of the restatements or that the Company will not determine to restate any financial statements in addition to the Affected Financial Statements or with respect to any additional accounting errors.

Although the Company cannot at this time estimate when it will file its restated financial statements, the Company is diligently pursuing completion of the restatements and intends to make such filings as soon as reasonably practicable following the completion of the review and the restatements. The Company's management and the Audit Committee have discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, Ernst & Young LLP.

133.    On this news, the price per share of the Company's common stock fell $0.78, or 28.1%, from a closing price of $2.77 per share on April 19, 2024 to close at $1.99 on April 25, 2024.

## **Subsequent Developments**

134.    On May 1, 2024, the Company disclosed that, on April 26, 2024, the Board "approved the termination of the employment of Brian Soller, the Chief Technology Officer and Executive Vice President of Corporate Development of the Company, for cause, effective as of May 1, 2024." The Company also announced that "[o]n April 29, 2024, [Defendant] Gomez-Quintero, the Chief Financial Officer of the Company, notified the Company of his resignation, effective May 1, 2024[]" and that "[i]n connection with

Verified Shareholder Derivative Complaint

his resignation, [Defendant] Gomez-Quintero is not entitled to receive any severance or other benefits upon his separation from the Company."

135.   The Company also revealed that Defendant Graeff's conduct triggered certain claw back provisions in his separation agreement. In relevant part, Luna disclosed:

> As previously disclosed, the Company entered into an Agreement with Scott Graeff, the Company's former President and Chief Executive Officer, on March 24, 2024 (the "Graeff Separation Agreement"). Pursuant to the Graeff Separation Agreement, all cash severance payments under the Graeff Separation Agreement and all shares underlying the restricted stock units that were accelerated pursuant to the Graeff Separation Agreement were subject to recoupment or immediate forfeiture by the Company upon a written determination in the reasonable, good faith discretion of the Board that Mr. Graeff engaged in conduct that constituted "Cause" under Mr. Graeff's employment agreement. On April 26, 2024, the Board determined that Mr. Graeff engaged in conduct that constituted Cause and the Company will cancel all future severance payments and Mr. Graeff will forfeit all shares underlying the accelerated vesting of the 10,000 restricted stock units under the Graeff Separation Agreement.

136.   The Company also reported that "[o]n May 1, 2024, *in connection with the previously announced independent review of the Company's historical financial statements being undertaken by a special committee of the Board*, in addition to the other personnel actions described in this report, *the Company terminated the employment of seven additional employees, effective immediately*."

137.   In addition, Luna revealed that the Board "will consider a wide range of options for the Company including, among other things, a potential sale, merger or other strategic transaction."

138.   On July 12, 2024, the Company revealed that Defendant Roedel, the Company's then-Interim President and Interim Executive Chairman was stepping down from both positions "due to health reasons, effective immediately." Less than two weeks later, on July 23, 2024, the Company announced Defendant Roedel's retirement from the Board.

## **REPURCHASES DURING THE RELEVANT PERIOD**

139.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $94,919 to repurchase approximately 14,573 shares of its own common stock at artificially inflated prices from May 2022 and December 2022.

140.    According to the 2Q22 10-Q, between May 1, 2022 and May 31, 2022, the Company repurchased 2,668 shares of its own common stock at an average price per share of approximately $5.95, for a total cost to the Company of approximately $15,875.[7]

141.    As the Company's stock was actually worth only $1.99 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid by approximately $10,565 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

142.    According to the 2022 10-K, between October 1, 2022 and October 31, 2022, the Company repurchased 1,360 shares of its own common stock at an average price per share of approximately $4.85, for a total cost to the Company of approximately $6,596.

143.    As the Company's stock was actually worth only $1.99 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid by approximately $3,890 for repurchases of its own stock between October 1, 2022 and October 31, 2022.

144.    According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company repurchased 5,036 shares of its own common stock at an average price per share of approximately $5.23, for a total cost to the Company of approximately $26,338.

145.    As the Company's stock was actually worth only $1.99 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid by

---

[7] Upon information and belief, these repurchases were made during the Relevant Period.

Verified Shareholder Derivative Complaint

approximately $16,317 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

146.    According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company repurchased 5,509 shares of its own common stock at an average price per share of approximately $8.37, for a total cost to the Company of approximately $46,110.

147.    As the Company's stock was actually worth only $1.99 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid by approximately $35,147 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

148.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $65,918.

## DAMAGES TO LUNA

149.    As a direct and proximate result of the Individual Defendants' conduct, Luna has lost and will continue to lose and expend many millions of dollars.

150.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

151.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

Verified Shareholder Derivative Complaint

153.    Such losses include the Company's overpayment of over $65,918 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

154.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

155.    As a direct and proximate result of the Individual Defendants' conduct, Luna has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

156.    Plaintiff brings this action derivatively and for the benefit of Luna to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Luna, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act.

157.    Luna is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.    Plaintiff is, and has been at all relevant times, a shareholder of Luna. Plaintiff will adequately and fairly represent the interests of Luna in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

160.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Luna's Board consisted of the following six individuals: Defendants

Phelps, Anderson, Chanley, Spiegel, and Vitale (the "Director-Defendants") and non-party Kevin Ilcisin (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors that were on the Board at the time this action was filed.

161.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $65,918 for repurchases of its own stock while the stock price was artificially inflated due to the false and misleading representations discussed herein, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

162.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Luna to issue materially false and misleading statements. Specifically, the Director-Defendants caused Luna to issue false and misleading statements which were intended to make Luna appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.   Additional reasons that demand on Defendant Phelps is futile follow. Defendant Phelps has served as Chair of the Board since July 16, 2024 and as a Company director since 2017. He also serves as Chair of the Audit Committee, Chair of the Nominating & Governance Committee, and as a member of the Compensation Committee. Defendant Phelps has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of

the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2022 10-K, which, as noted herein, included unearned revenues that should not have been recognized. For these reasons, Defendant Phelps breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164. Additional reasons that demand on Defendant Anderson is futile follow. Defendant Anderson has served as a Company director since May 2017. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating & Governance Committee. Defendant Anderson has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2022 10-K, which, as noted herein, included unearned revenues that should not have been recognized. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Chanley is futile follow. Defendant Chanley has served as a Company director since December 2023. Defendant Chanley has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant

Chanley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Spiegel is futile follow. Defendant Spiegel has served as a Company director since 2015. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and Nominating & Governance Committee. Defendant Spiegel has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading 2022 10-K, which, as noted herein, included unearned revenues that should not have been recognized. For these reasons, Defendant Spiegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Vitale is futile follow. Defendant Vitale has served as a Company director since September 2019. Defendant Vitale has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, she signed the false and misleading 2022 10-K, which, as noted herein, included unearned revenues that should not have been recognized. For these reasons, Defendant Vitale breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

168.    Additional reasons that demand on non-party Kevin Ilcisin ("Ilcisin") is futile

follow. Ilcisin has served as the Company's President and CEO and as a Company director since August 1, 2024. The Company provides Ilcisin with his principal occupation for which he receives handsome compensation. He is beholden to the other members of the Board that enable that compensation, including the Director-Defendants, who are all primary wrongdoers. In addition, since his appointment as President, CEO, and as a Company director, Ilcisin, as the Company's highest officer, has failed to take action to redress the harm to the Company caused by the Individual Defendants named herein. Further, Ilcisin is unlikely to take action that would risk his primary source of livelihood. Moreover, as the Company admits, he is a non-independent director. For these reasons, Ilcisin is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on the Board is futile follow.

170.    Defendants Phelps, Anderson, and Spiegel (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

171.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to

issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

172. Luna has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Luna any part of the damages Luna suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

173. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

174. The acts complained of herein constitute violations of fiduciary duties owed by Luna's officers and directors, and these acts are incapable of ratification.

175. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their

protection with corporate funds, i.e., monies belonging to the stockholders of Luna. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Luna, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

176.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Luna to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

177.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 20(a)
of the Exchange Act**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants, by virtue of their positions with Luna and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Luna and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had

the power and influence and exercised the same to cause Luna to engage in the illegal conduct and practices complained of herein.

180.    Plaintiff, on behalf of Luna, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Luna. Not only is Luna now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Luna by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 14,573 of its own shares at artificially inflated prices, damaging Luna.

183.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and practiced in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

184.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Luna not misleading.

185.    The Individual Defendants, as top executives and directors of the Company,

Verified Shareholder Derivative Complaint

are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Luna.

186.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

187.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

188.    Plaintiff, on behalf of Luna, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Luna's business and affairs.

191.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Luna.

193.   In breach of their fiduciary duties owed to Luna, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's quarterly and annual reports filed with the SEC during the Relevant Period included unearned revenues that should not have been recognized; (2) due to the foregoing, the Company would need to restate these financial results; (3) the Company's disclosure controls and procedures did not provide reasonable assurance with respect to the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP"); (4) the Company's disclosure controls and procedures were not effective; and (5) due to the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

194.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

195.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed.

196.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

197.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose

such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Luna's securities.

198.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Luna's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

199.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

200.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Luna has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201.    Plaintiff, on behalf of Luna, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual

Defendants were unjustly enriched at the expense of, and to the detriment of, Luna.

204.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Luna that was tied to the performance or artificially inflated valuation of Luna or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

205.   Plaintiff, as a shareholder and a representative of Luna, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

206.   Plaintiff, on behalf of Luna, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Abuse of Control**

207.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Luna, for which they are legally responsible.

209.   As a direct and proximate result of the Individual Defendants' abuse of control, Luna has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210.   Plaintiff, on behalf of Luna, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

211.   Plaintiff incorporates by reference and re-alleges each and every allegation set

1  forth above, as though fully set forth herein.

2  212.   By their actions alleged herein, the Individual Defendants, either directly or

3  through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

4  duties with regard to prudently managing the assets and business of Luna in a manner

5  consistent with the operations of a publicly held corporation.

6  213.   As a direct and proximate result of the Individual Defendants' gross

7  mismanagement and breaches of duty alleged herein, Luna has sustained and will continue

8  to sustain significant damages.

9  214.   As a result of the misconduct and breaches of duty alleged herein, the

10 Individual Defendants are liable to the Company.

11 215.   Plaintiff, on behalf of Luna, has no adequate remedy at law.

12                              **SEVENTH CLAIM**

13      **Against the Individual Defendants for Waste of Corporate Assets**

14 216.   Plaintiff incorporates by reference and re-alleges each and every allegation set

15 forth above, as though fully set forth herein.

16 217.   The Individual Defendants caused the Company to pay the Individual

17 Defendants excessive salaries and fees, to the detriment of the shareholders and the

18 Company.

19 218.   As a result of the foregoing, and by failing to properly consider the interests

20 of the Company and its public shareholders, the Individual Defendants have caused Luna

21 to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or

22 costs to defend unlawful actions, to engage in internal investigations, and to lose financing

23 from investors and business from future customers who no longer trust the Company and

24 its products.

25 219.   In addition, the Individual Defendants caused the Company to repurchase

26 thousands of shares of its own common stock at artificially inflated prices, thereby wasting

27 the Company's assets.

28

220.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

221.   Plaintiff, on behalf of Luna, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Graeff, Nestro, and Gomez-Quintero for Contribution Under Sections 10(b) and 21D of the Exchange Act

222.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.   Luna and Defendants Graeff, Nestro, and Gomez-Quintero are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Graeff's, Nestro's, and Gomez-Quintero's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

224.   Defendants Graeff, Nestro, and Gomez-Quintero, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

225.   Accordingly, Defendants Graeff, Nestro, and Gomez-Quintero are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

226.   As such, Luna is entitled to receive all appropriate contribution or indemnification from Defendants Graeff, Nestro, and Gomez-Quintero.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Luna, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Luna;

(c)    Determining and awarding to Luna the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Luna and the Individual Defendants to take all necessary actions to reform and improve Luna's corporate governance and internal procedures to comply with applicable laws and to protect Luna and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Luna to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Luna restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

Verified Shareholder Derivative Complaint

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 21, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Soon Keai Jimmy Sim, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20__ day of May, 2025.

Signed by:

_____
328F7E0039704A3

Soon Keai Jimmy Sim